274 N.J. Super. 15 (1994)
643 A.2d 18
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS GREEN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 25, 1994.
Decided May 23, 1994.
*18 Before Judges BAIME, CONLEY and VILLANUEVA.
Susan L. Reisner, Acting Public Defender, attorney for appellant (William Welaj, designated counsel, of counsel and on the brief).
Deborah T. Poritz, Attorney General, attorney for respondent (Paul H. Heinzel, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Defendant Thomas Green appeals from convictions for felony murder (N.J.S.A. 2C:11-3a(3)), possession of cocaine with intent to distribute (N.J.S.A. 2C:35-5b(2)), theft by receiving stolen property *19 (N.J.S.A. 2C:20-7) and violating regulations pertaining to the purchase and sale of firearms (N.J.S.A. 2C:39-10). The jury also found defendant guilty of reckless manslaughter (N.J.S.A. 2C:11-4b), kidnapping (N.J.S.A. 2C:13-1b(1)), possession of cocaine (N.J.S.A. 2C:35-10a(1)), possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a), and possession of a handgun without a permit (N.J.S.A. 2C:39-5b), but these convictions were merged at sentencing. The trial court sentenced defendant to a thirty year custodial term to be served without parol eligibility on the felony murder conviction. A consecutive ten year sentence with a five year parole disqualifier was imposed on the possession of cocaine with intent to distribute conviction. Concurrent sentences were imposed on the remaining convictions.
Although numerous arguments are advanced in the copious briefs submitted by defendant and his appellate attorney, the principal claim is that he was deprived of the effective assistance of counsel. Defendant contends that he is entitled to an automatic reversal because the lawyer who conducted his defense at trial was suspended from the practice of law for failure to pay his assessment to the client security fund. He also asserts that trial counsel's chronic alcoholism and drug addiction, which became apparent only after the lawyer's arrest for possession of cocaine following the jury's verdict, created a rebuttable presumption that his representation was ineffective.
We hold that the attorney's temporary suspension for failure to pay the annual fee did not, by itself, deprive defendant of his constitutional right to counsel. We also conclude that trial counsel's drug dependency did not generate a presumption of inadequate representation. Our thorough examination of the record does not support the thesis that trial counsel made errors so serious as to deprive defendant of a fair trial. We thus affirm defendant's convictions.

I.
Defendant was tried on consolidated indictments. Stripped to its essentials, one indictment alleged that Green, Jon Brett Hemby *20 and Milton Adams kidnapped and murdered Larry Williams. The other charged Green alone with drug and assorted narcotics-related offenses. The State's theory was that defendant and the codefendants were engaged in a drug distribution scheme and that they kidnapped and murdered Williams in retaliation for the victim's earlier robbery of one of their confederates.
Taalib Muhammad was the prosecution's chief witness. According to Muhammad, on August 24, 1989, he and Williams were walking along Dayton Street in Newark when they were accosted by defendant, Hemby and Adams who had emerged from one of two automobiles that had stopped suddenly at the curb. One of the men accused Muhammad and Williams of "beating [their] runner." While defendant's attention was focused on Muhammad, the other two men, both brandishing handguns, grabbed Williams and "shoved [him] into" one of the automobiles. As the two men grappled with Williams, Muhammad managed to seize defendant, placing him in a "choke hold." The other automobile, driven by a young woman, suddenly "u-turned," causing Muhammad to lose his balance and release the defendant. As defendant ran toward the car containing Williams, he shouted to his compatriots, "kill the mother fuckers." One of the armed men opened fire, narrowly missing Muhammad who was nevertheless able to escape.
Muhammad testified that he was familiar with defendant prior to the incident. Several weeks before the killing, he and Williams had robbed cocaine from several "dealers" in the area. Muhammad believed that defendant was associated with the men they had robbed because he was often seen driving a late model BMW or Volvo in the vicinity and frequenting a building from which cocaine was generally sold.
Williams's body was discovered on Frelinghuysen Avenue the next day. He had a single bullet wound to the chest. Upon canvassing the area, the police located a 13 year old girl who had witnessed the incident. She observed five men engaged in an altercation. Although the witness was unable to identify any of the individuals involved, she testified that she observed a tall man *21 "holding" a shorter person who was protesting that he was "not the one who had done it." Another man stood on the grass restraining a fourth individual. According to the witness, a fifth man emerged from near a parked automobile and fired several shots.
Subsequent to the victim's death, Muhammad, who was incarcerated on other charges, described the incident to a prosecutor's investigator. Although Muhammad claimed that he did not expect favorable treatment, he ultimately entered into a plea agreement relating to pending drug charges. Muhammad identified defendant and the codefendants from photographic arrays. He also showed the police where defendant resided.
Defendant was arrested at his home on October 20, 1989. The police discovered a substantial amount of cocaine as well as drug paraphernalia, including a triple beam scale, a bowl containing a sifter and rubber bands, and a large quantity of empty vials. The police also confiscated a police scanner radio, a pistol, and a.22 caliber revolver containing ten rounds of ammunition.
Defendant was transported to police headquarters where he was advised of his constitutional rights. In his written statement, defendant admitted that he was present when Williams was shot but denied participation in the kidnapping and killing. Defendant claimed that he was lured to the scene by Muhammad upon the pretense that he had a supply of firearms for sale. According to defendant, Hemby, who was also present, shot and killed Williams, Muhammad's accomplice in the scheme, after Muhammad pulled out a gun and threatened to kill Green. Defendant explained that Hemby and Adams grabbed Williams and Hemby shoved him into defendant's automobile. Defendant denied that any shots were fired during the altercation on Dayton Street. The shooting took place "across the street from Kentucky Fried Chicken on Frelinghuysen Avenue."
Defendant elected to testify. According to his account, Terrence Romer and Muhammad approached him outside the apartment complex where he and Romer resided to determine whether *22 he was interested in purchasing an Uzi machine gun. After agreeing upon a price, Muhammad departed, but returned to the apartment building shortly thereafter and directed defendant to drive his car to a location on Dayton Street. Accompanied by Muhammad, Williams, Hemby and Adams and followed by his girlfriend, Andrea Miles, defendant drove to the prearranged spot. Defendant testified that Muhammad handed him the key to his automobile which was parked nearby and told him to open the trunk. Defendant recounted that, after he gave $300 to Hemby, Muhammad grabbed him, put a gun to his head, and threatened to kill him. While this was taking place, Hemby allegedly seized Williams and threw him into defendant's automobile. Defendant testified that he then "broke away" from Muhammad's grip and ran to his car. He heard "a couple" of "gunshots." With Adams seated in the hatchback area and Hemby restraining Williams in the back seat, defendant drove off. While driving, defendant heard Williams moaning. Hemby told defendant he had shot Williams in the leg. Defendant testified that he immediately stopped the car and Hemby and Adams pushed Williams out the door. Throughout his testimony, defendant disavowed the assertion that he participated in the kidnapping and shooting of Williams. While admitting that his statement to the police deviated from his trial testimony in various particulars, he claimed that he signed the document only because he was told his girlfriend would otherwise be arrested and his child taken to a foster home.
Defendant's account of the incident was partially corroborated by Terrence Romer and the victim's girlfriend, Mindy Thomas. Thomas testified that she, Muhammad and Williams ingested drugs on the night of the killing. Muhammad and Williams then left their hotel room, carrying toy guns which Thomas believed resembled an Uzi machine gun, and a .38 caliber revolver. Romer testified that Muhammad approached him outside the apartment building and inquired whether he knew anyone interested in buying a gun. At that point, defendant allegedly arrived and agreed to purchase a weapon. Muhammad allegedly left the area but returned shortly thereafter with Williams. Romer last saw *23 defendant, Hemby, Adams, Muhammad and Williams enter Green's automobile.
Based upon this evidence, the jury found defendant guilty of the specified charges. Prior to sentencing, defendant's trial attorney, R.R., was arrested for possession of cocaine. It was also learned that the attorney had been suspended from the practice of law for failing to pay his assessment to the client security fund and that his suspension continued throughout defendant's trial. The Public Defender's Office assigned an attorney to represent defendant at sentencing.
While this appeal was pending, we granted defendant's application for a remand to the Law Division to enable him to move for a new trial based upon newly discovered evidence relating to R.R.'s ineligibility and his drug addiction. The following salient facts were developed at the hearing. R.R. testified that he was arrested for possession of cocaine following the jury's verdict but before sentencing. The attorney was subsequently granted a conditional discharge and the charges against him were ultimately dismissed.
R.R. explained that he was an "active alcoholic and [drug] addict" for 25 years. From 1985 to 1988, R.R. was dependent upon cocaine. While candidly admitting that he was an "active addict," the attorney emphasized that he never used drugs or alcohol during defendant's trial. R.R. nevertheless admitted that he had "cravings to drink" and harbored the "mindset of an alcoholic and [drug] addict." Moreover, the attorney testified that he continued to drink and ingest cocaine during the year he represented defendant.
R.R. claimed that he accepted a $7,000 retainer which did not include funds to retain an investigator. Instead, R.R. agreed to act as his own investigator. The attorney admitted that defendant asked him to interview and subpoena Andrea Miles. R.R. testified that Miles was located early in his investigation, but disappeared before trial. The attorney was aware that the prosecutor's attempt to find the witness had proved unavailing. R.R. asserted that he was not concerned with Miles's absence because the *24 statements she had given to the police were partially inculpatory and her effectiveness as a defense witness was compromised because she had often visited defendant at the county jail. Although defendant claimed in his moving papers that he also requested R.R. to interview a person known as Malik, the attorney did not recall such a request.
R.R. also explained why he had agreed to consolidation of the indictments. Specifically, the attorney believed that defendant's participation in a drug distribution organization was so related to the murder indictment that it would be admissible as other crime evidence in that trial. He also reasoned that defendant would be subject to an extended term if the charges were severed and Green found guilty at separate trials. R.R. originally urged defendant to enter into a plea agreement because of the strength of the State's evidence. When defendant elected to contest the charges, the attorney advised him not to take the stand, but again Green disagreed. R.R. believed that defendant destroyed any possibility of obtaining a favorable verdict when he responded in a hostile manner to the prosecutor's questions on cross examination.
R.R. emphasized that he did not drink or take drugs during defendant's trial. He believed that he "worked real hard" conducting the defense. Although the attorney asserted that he vigorously represented his client, he admitted that his representation of defendant could have been more skilled. As phrased by R.R., he thought he "did a good job," but "in a sense [defendant did not get] the best advocacy [of which he] was capable ... because [the attorney] had the mindset of an alcoholic."
The prosecutor who tried the case for the State testified that R.R. was punctual and well prepared throughout the proceedings. The prosecutor, a seasoned criminal trial lawyer, described R.R. as a "zealous ... advocate" who had vigorously represented his client.
The judge who presided over defendant's trial submitted an affidavit, confirming the prosecutor's description of R.R.'s efforts. She noted that R.R. was always punctual and well prepared. The *25 judge observed that R.R. had exhibited no "physical manifestations" or "behavioral signs" of drug abuse and that he was extremely vigorous in conducting the defense.
Defendant's testimony at the remand hearing substantially conflicted with that of R.R. We need not describe in detail defendant's version. We note that the Law Division found R.R. to be a credible witness. In contrast, defendant's testimony was found to be unworthy of belief. The court's findings in that respect are supported by substantial, credible evidence present in the record. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964). Accordingly, we merely note that by defendant's account the attorney was given a $14,000 retainer but appeared disinterested in presenting his defense. Defendant complained that R.R. failed to discuss with him the question of whether to consolidate the indictments. So too, defendant asserted that R.R. failed to subpoena Miles and Malik, gave him improper advice by suggesting that he take the stand and did not move to "arrest the [jury's] verdict."
The Law Division judge rendered a thorough and well-reasoned oral opinion, denying defendant's motion for a new trial. The court first determined that R.R.'s suspension from the practice of law was not related to the quality of his representation of the defendant. The court further concluded that R.R.'s drug addiction, though lamentable, was not a basis for presuming that his defense of defendant was ineffective. From its review of the evidence, the court found that R.R.'s strategic and tactical decisions did not fall below an objective standard of reasonableness measured by prevailing professional norms and that defendant's Sixth Amendment rights were not violated.
It is against this backdrop that we consider defendant's arguments.

II.
It is undisputed that during defendant's trial his attorney was rendered administratively ineligible to practice law due to the *26 failure to pay his annual assessment to the Clients' Security Fund (now the New Jersey Lawyers' Fund for Client Protection) as required by R. 1:28. Defendant contends that he was thus deprived of his constitutional right to the assistance of counsel.
Both the Sixth Amendment and our Constitution (N.J. Const. art. I, ¶ 10) direct that in all criminal prosecutions the accused shall have the right to the assistance of counsel in his defense. We do not equate the "counsel" to which these constitutional provisions refer with a "member of the bar in good standing," in common parlance. As we see it, R.R.'s default in payment of the requisite assessment and his resulting decertification differ from a disciplinary suspension or disbarment. While we do not endorse the attorney's gross inattention to our rules, this oversight had no connection with the lawyer's character, intellectual acuity, or dedication to the client's interest. "[S]uspensions used to wring money from lawyers' pockets do not stem from any doubt about their ability to furnish zealous and effective assistance." Reese v. Peters, 926 F.2d 668, 670 (7th Cir.1991). Lawyers who do not pay their assessments violate a legal norm, but not one established for the protection of their clients. Ibid.
By contrast, the Sixth Amendment guaranty of the right to the assistance of counsel and New Jersey's constitutional counterpart implicate far weightier concerns. The Sixth Amendment right to counsel is a vital ingredient in the scheme of due process tracing its paternity to the landmark case of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). New Jersey has since very early times given strong recognition to the criminal defendant's right to an attorney. Rodriguez v. Rosenblatt, 58 N.J. 281, 285, 277 A.2d 216 (1971). Such a guaranty has been included in New Jersey's organic law since 1776. See N.J. Const. of 1776 art. XVI; N.J. Const. of 1844 art. I, ¶ 8. The constitutional right to counsel envisages the effective assistance of an attorney in his professional capacity. The idea, one deeply embedded in our jurisprudence, is that the average defendant "does not have the professional legal skill to protect himself when brought before a tribunal with power *27 to take his life or liberty[,]" Johnson v. Zerbst, 304 U.S. 458, 462-63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461, 1465-66 (1938), and that without the guiding hand of counsel, the accused may lose his freedom because he does not know how to establish his innocence, Powell v. Alabama, 287 U.S. at 69, 53 S.Ct. at 64, 77 L.Ed. at 170. Once appointed or retained, an attorney becomes bound to fully and faithfully serve the interests of his client within the bounds of professional ethics. State v. Ercolino, 65 N.J. Super. 20, 27, 166 A.2d 797 (App.Div. 1961). Under the Federal and State constitutions, a criminal defendant is entitled to reasonably competent counsel and if the attorney's performance has been so deficient as to create a reasonable probability these deficiencies materially contributed to his conviction, the guaranty will have been violated. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987).
The constitutional question is "whether the court has satisfied itself of the advocate's competence and authorized him to practice law." Reese v. Peters, 926 F.2d at 670. In that context, persons who have obtained their legal credentials by fraud are classes apart from those who passed the bar examination but later ran afoul of some technical rule. We are not concerned here with an imposter who masquerades as an attorney or an individual who has never been admitted to the bar at all. See, e.g., United States v. Novak, 903 F.2d 883 (2d Cir.1990); People v. Williams, 140 Misc.2d 136, 530 N.Y.S.2d 472 (Sup.Ct. 1988); People v. Felder, 47 N.Y.2d 287, 418 N.Y.S.2d 295, 391 N.E.2d 1274 (1979); Huckelbury v. State, 337 So.2d 400 (Fla. Dist. Ct. App. 1976); Leonard v. Walsh, 73 Ill. App.2d 45, 220 N.E.2d 57 (1966). The risks to individual clients and to the integrity of the legal system that are posed when a defendant is represented by a person who has never qualified to practice law are not present here. R.R. was a highly experienced criminal lawyer, having tried some 200 cases including 25 homicides. He had graduated from an accredited law school and passed the bar. He was duly admitted to practice in New *28 Jersey. And he was not disbarred or suspended for disciplinary infractions.
The reasons for suspension can be so varied in kind and degree that imposition of a per se rule is inappropriate. Although we have found no reported New Jersey opinion bearing upon the precise issue raised here, we join the unanimous view of other jurisdictions that a conviction should not be annulled merely because the defendant was represented by an attorney whose license was suspended for financial reasons. See Reese v. Peters, 926 F.2d 668; Beto v. Barfield, 391 F.2d 275 (5th Cir.), cert. denied, 393 U.S. 888, 89 S.Ct. 205, 21 L.Ed.2d 166 (1968); United States v. Dumas, 796 F. Supp. 42, 45-46 (D.Mass. 1992); People v. Brigham, 151 Ill.2d 58, 175 Ill.Dec. 720, 600 N.E.2d 1178 (1992); Jones v. State, 747 S.W.2d 651 (Mo. Ct. App. 1988); People v. Medler, 177 Cal. App.3d 927, 223 Cal. Rptr. 401 (1986); Dolan v. State, 469 So.2d 142 (Fla. Dist. Ct. App. 1985); White v. State, 464 So.2d 185 (Fla. Dist. Ct. App. 1985); Johnson v. State, 225 Kan. 458, 590 P.2d 1082 (1979); People v. Brewer, 88 Mich. App. 756, 279 N.W.2d 307 (1979); Hill v. State, 393 S.W.2d 901 (Tex. Crim. App. 1965); cf. United States v. Williams, 934 F.2d 847, 851-52 (7th Cir.1991) (order suspending counsel's license for professional misconduct concerning matters unrelated to defendant's trial did not render that assistance per se ineffective); United States v. Mouzin, 785 F.2d 682, 694-99 (9th Cir.) (no right to counsel violation where attorney disbarred during trial for unbecoming conduct related to other matters), cert. denied sub nom. Carvajal v. United States, 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986); United States v. Costanzo, 740 F.2d 251, 257-59 (3d Cir.1984) (although attorney had been suspended in two state courts, he was a member in good standing in several federal courts and thus his admission pro hac vice in the New Jersey federal district court did not result in petitioner receiving no "representation in fact"), cert. denied, 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985); United States v. Hoffman, 733 F.2d 596 (9th Cir.) (suspension from practice before the state bar for failure to file income tax returns and conduct prejudicial to the administration of justice does not automatically *29 result in a Sixth Amendment violation by counsel practicing before the federal district court), cert. denied, 469 U.S. 1039, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984); United States v. Messer, 647 F. Supp. 704, 707 (D.Mont. 1986) ("an attorney's suspension or disbarment does not, without more, rise to the constitutional significance of ineffective assistance of counsel under the Sixth Amendment"); State v. Smith, 476 N.W.2d 511, 513-14 (Minn. 1991) (counsel's mid-trial suspension for substantive reasons concerning unrelated matters does not result in a per se Sixth Amendment violation).

III.
We also reject defendant's argument that R.R.'s alcoholism and drug dependency created a rebuttable presumption that his conduct of the defense was constitutionally defective. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, the United States Supreme Court adopted a two-part test for evaluating claims of ineffective assistance of counsel. First, the defendant must show that counsel's performance was deficient. Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. As to counsel's performance, the Court noted that client loyalty, adequate consultation, and legal proficiency are relevant factors in determining whether assistance was effective, but that no particular set of detailed rules can satisfactorily take account of the variety of circumstances and range of choices affecting the accused's defense. Id. at 688-89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Second, the defendant must show that counsel's errors were so egregious as to have deprived him of a fair trial. Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. To satisfy the prejudice standard, the defendant must show that his attorney's inadequacies were so serious as to undermine the court's confidence in the reliability of the jury's verdict. Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. In State v. Fritz, 105 N.J. 42, 519 A.2d 336, our Supreme Court adopted the same standards in defining our own State constitutional guaranty of effective assistance of counsel. Id. at 58, 519 A.2d 336.
*30 We discern no sound basis to adopt less rigorous standards merely because it is shown that a defendant's trial attorney was drug dependent. A per se rule would create a presumption against the competence of attorneys with drinking or drug problems and would invite convicted defendants to delve into the personal lives of their lawyers on the basis of mere speculation. It bears repeating that convicted prisoners are strongly motivated to attack the competency of trial counsel. The "rubber-stamp familiarity" and "monotonous regularity" of such claims are well-known to appellate judges. State v. Buffa, 65 N.J. Super. 421, 424, 168 A.2d 49 (App.Div. 1961). We recognize that there are both good attorneys and bad attorneys and that even the best of counsel make mistakes. However, we are satisfied that the two-part test adopted in Strickland and Fritz is sufficiently protective of a defendant's rights. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether the mistakes made prejudiced the defendant's right to a fair trial.
Although the issue presented is of first impression in New Jersey, the result we reach is in accord with the great weight of authority. See Burnett v. Collins, 982 F.2d 922, 930 (5th Cir.1993) ("[petitioner] points to no specific instances where counsel's performance during trial was deficient because of alcohol abuse"); Berry v. King, 765 F.2d 451, 454 (5th Cir.1985) ("under Strickland the fact that an attorney used drugs is not, in and of itself, relevant to an ineffective assistance claim"), cert. denied, 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986); Young v. Zant, 727 F.2d 1489, 1492-93 (11th Cir.1984) (petitioner's observation that counsel ingested drugs during trial, counsel's conviction for possession of marijuana shortly after trial, and counsel's admission of his drug problem in another proceeding do not automatically support a claim of ineffectiveness), cert. denied, 470 U.S. 1009, 105 S.Ct. 1371, 84 L.Ed.2d 390 (1985); McDougall v. Rice, 685 F. Supp. 532, 539-40 (W.D.N.C. 1988) ("[e]vidence that counsel was treated at hospitals at various times during trial or that counsel used prescription drugs during this period is insufficient to state a *31 claim of ineffective assistance of counsel"); Hernandez v. Wainwright, 634 F. Supp. 241, 245 (S.D.Fla. 1986) (an attorney's indulgence in alcohol is not enough in itself to constitute a per se Sixth Amendment violation; rather, the inquiry is "whether, regardless of the cause, [counsel's] representation ... was deficient and whether [the] deficiency prejudiced the [p]etitioner"), aff'd, 813 F.2d 409 (11th Cir.1987); State v. Coates, 241 Mont. 331, 786 P.2d 1182, 1186-87 (1990) ("absent any specific errors or conduct identified in the trial that affected [its] outcome, [counsel's] cocaine abuse is irrelevant to the issue of ineffective assistance of counsel"); People v. Garrison, 47 Cal.3d 746, 254 Cal. Rptr. 257, 765 P.2d 419, 440-41 (1989) (defendant failed to prove trial counsel's performance was deficient and "[h]is reliance on a per se rule of deficiency for alcoholic attorneys is contrary to settled law").
Applying these principles, we find nothing in the record to support defendant's claim that his trial attorney was ineffective. Initially, we do not find fault with counsel's decision to agree to consolidation of the indictments. Had counsel not joined in such a motion, the State would have likely prevailed in any event. See R. 3:7-6; R. 3:15-1. Moreover, it cannot fairly be said that joinder of the indictments was prejudicial to defendant's interests. A trial court is accorded substantial discretion in determining whether to grant relief from joinder of offenses because of the potential for prejudice. State v. Pitts, 116 N.J. 580, 601, 562 A.2d 1320 (1989); State v. Briley, 53 N.J. 498, 503, 251 A.2d 442 (1969); State v. Manney, 26 N.J. 362, 368, 140 A.2d 74 (1958). One of the key questions is whether evidence of the offenses sought to be severed would be admissible in the trial of the other charges. State v. Pitts, 116 N.J. at 601-02, 562 A.2d 1320; State v. Moore, 113 N.J. 239, 274, 550 A.2d 117 (1988). Here, defendant's participation in drug sales constituted critical evidence in establishing his motive for killing Williams. See State v. Erazo, 126 N.J. 112, 130-31, 594 A.2d 232 (1991) (evidence of other crimes admissible to prove motive); State v. Baldwin, 47 N.J. 379, 391, 221 A.2d 199 (defendant's involvement in another crime relevant to establish motive), *32 cert. denied, 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966); State v. Slocum, 130 N.J. Super. 358, 362-63, 327 A.2d 244 (App. Div. 1974) (victim of assault beaten in retaliation for prior testimony against defendant). It was the State's theory that defendant retaliated against the victim and Muhammad for their earlier robbery of one of his "drug runners." Defendant's motive in participating in the kidnap and murder of Williams was thus a genuine issue in the case. State v. Stevens, 115 N.J. 289, 301, 558 A.2d 833 (1989); Evid.R. 55 (now N.J.R.E. 404(b)).
We also cannot fairly say that counsel was deficient in failing to subpoena Andrea Miles. Miles disappeared before trial and even the prosecutor, with her extensive investigative resources, could not locate her. In any event, counsel reasonably concluded that Miles would not be a good defense witness because several of her statements tended to inculpate the defendant. Moreover, her credibility could have been attacked by the prosecution because she had visited defendant at the county jail. In our view, trial counsel thoroughly investigated all possible options and his trial strategy was "`virtually unchallengeable.'" State v. Savage, 120 N.J. 594, 617, 577 A.2d 455 (1990) (quoting Strickland v. Washington, 466 U.S. at 690-91, 104 S.Ct. at 2065-66, 80 L.Ed.2d at 695).
R.R. apparently advised defendant not to take the stand. Defendant did not accept this advice. In any event, the decision of whether to testify belonged ultimately to the defendant. State v. Buonadonna, 122 N.J. 22, 36, 583 A.2d 747 (1991). The point to be stressed is that trial counsel carefully consulted with defendant concerning his decision. There is nothing in the record to support the conclusion that the advice counsel gave was faulty or deprived defendant of a fair trial.
In sum, the record does not substantiate defendant's claim of ineffective assistance of counsel. Perhaps it is true that R.R. could have better represented his client had he not been drug dependent. However, "the right to counsel is the right only to the effective assistance of counsel, not to the best counsel." Madden *33 v. Township of Delran, 126 N.J. 591, 599, 601 A.2d 211 (1992). We are thoroughly convinced from our examination of the record that trial counsel's performance comported with all applicable professional norms and that defendant was not deprived of his Federal or State constitutional rights.

IV.
We perceive no basis for a reversal of defendant's convictions in the remaining points urged by appellate counsel. Specifically, we find no merit in counsel's claim that (1) errors in the prosecutor's summation deprived defendant of a fair trial, (2) the jury's verdict regarding kidnapping and felony murder was against the weight of the evidence, and (3) the aggregate sentence imposed was excessive. R. 2:11-3(e)(2). We nevertheless offer the following brief comments.
Although we find no error warranting a reversal, we note that the prosecutor exceeded the bounds of fair comment at several points in her summation. In her testimony, Mindy Thomas claimed that the prosecutor threatened to dismiss the charges against defendant if she were to appear as a defense witness. In response to the State's questions in cross-examination, Thomas admitted that she had "probably" been "high" on drugs when she conversed with the prosecutor. In her summation, the prosecutor referred to Thomas's state of confusion and added that she "would [not] risk [her] license and [her] job" by seeking to prevent the witness from appearing at trial. While we believe that it was fair comment to point out the implausibility of Thomas's testimony, the prosecutor clearly went too far in suggesting that she would have been subject to disbarment and dismissal had she actually sought to bar the witness from appearing in court. We also find that the prosecutor erred by stating her opinion that Muhammad was not armed when he was accosted by defendant. Although a prosecutor should neither comment on matters not in evidence nor declare his or her personal opinion concerning a fact in issue, State v. Ramseur, 106 N.J. 123, 321, 524 A.2d 188 (1987); State v. Farrell, *34 61 N.J. 99, 103, 293 A.2d 176 (1972), we are satisfied that these isolated and fleeting remarks did not prejudice defendant's rights.
We also reject defendant's argument that the verdict was against the weight of the evidence. At the outset, we note that defendant failed to move for a new trial on this basis and, thus, the issue is not cognizable on appeal. R. 2:10-1. Beyond this, our examination of the record discloses ample evidence supporting the jury's verdict. Muhammad's testimony and defendant's custodial statement supported the jury's findings that defendant was an accomplice in the kidnap and felony murder of Williams. As to the charge of kidnapping, the jury could reasonably have found that Williams was transported a "substantial distance," State v. Masino, 94 N.J. 436, 445-47, 466 A.2d 955 (1983) or was confined for a "substantial period," State v. Smith, 210 N.J. Super. 43, 58-61, 509 A.2d 206 (App.Div.), certif. denied, 105 N.J. 582, 523 A.2d 210 (1986), and that the risk of harm was enhanced from the asportation and isolation of the victim. With respect to the charge of felony murder, the jury could reasonably have found that defendant "solicit[ed], request[ed], command[ed] [or] importune[d]" the homicidal act and that he had "reasonable ground[s] to believe" that Hemby or Adams was "armed with ... a weapon," thus rendering nugatory the affirmative defense provided by N.J.S.A. 2C:11-3a(3)(a), (b), (c) and (d). It does not "clearly appear[] that there was a miscarriage of justice under the law." R. 2:10-1.
We find no sound reason to disturb the aggregate sentence imposed. In that respect, we reject defendant's claim that the sentencing court ignored applicable mitigating factors. And although it is arguable that the Law Division was in error when it considered as an aggravating factor the nature and circumstances of the offense as it pertained to the conviction for possession of cocaine with intent to distribute, the sentence imposed on that count was entirely reasonable. Lastly, the cumulative nature of the sentences imposed was properly grounded in the guidelines adopted by our Supreme Court in State v. Yarbough, 100 N.J. 627, *35 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).

V.
Finally, we reject the arguments advanced in defendant's overlength pro se supplemental brief. We find no merit in defendant's contentions that (1) the trial court committed reversible error by curtailing counsel's cross-examination of the State's witness, (2) prosecutorial misconduct tainted the jury's verdict, (3) the trial court erred in denying counsel's application for the release of confidential homicide investigation reports, (4) the trial court committed plain error by failing to instruct the jury on lesser-included offenses of kidnapping, (5) the trial court committed plain error by failing to charge causation in the context of its felony murder instructions, (6) the trial court committed plain error in its instructions on accomplice liability, (7) the trial court erroneously instructed the jury on joint possession, and (8) the trial court impermissibly took away the jury's power of nullification. R. 2:11-3(e)(2). Only three of these arguments require comment.
Initially, our review of the record discloses several instances in which it is at least arguable that the trial court improperly limited defense counsel's cross examination of Muhammad. Specifically, the trial court perhaps did not afford counsel sufficient latitude in questioning Muhammad concerning his prior robbery of drug dealers including the "runner" who was allegedly one of defendant's compatriots. Having said this, we need not decide the issue. Assuming that error was committed, defendant was not harmed. In reaching this conclusion, we stress that counsel's cross-examination of Muhammad occupies an extensive part of an expansive trial transcript. Defendant's trial attorney intensively questioned the witness concerning discrepancies between his trial testimony and his written statements as well as his potential bias. Based upon counsel's sustained efforts, we do not discern any possibility that defendant was prejudiced by the rare instances in which cross-examination was precluded.
*36 Much of defendant's pro se supplemental brief is devoted to the trial court's refusal to require the State to produce confidential reports concerning other homicide investigations. In the State's case in chief, a prosecutor's investigator mentioned that defendant had provided information concerning several unsolved homicides. Defense counsel requested the State to produce its reports pertaining to these unrelated investigations. The trial court denied these requests on the ground that these reports were confidential. In the course of defendant's testimony, he denied that he had ever cooperated with the authorities concerning other homicide investigations. The defense was then confronted with a statement which indicated that defendant had provided the investigator with information on at least one homicide. The defense stipulated to the statement's authenticity and it was submitted to the jury.
Defendant contends that in order to cross-examine the investigator, he was entitled to receive any statement he had given to the witness. In the abstract, we agree with this proposition. See State v. Tate, 47 N.J. 352, 355, 221 A.2d 12 (1966); State v. Gallicchio, 44 N.J. 540, 548, 210 A.2d 409 (1965); State v. Hunt, 25 N.J. 514, 523-31, 138 A.2d 1 (1958); State v. Mucci, 25 N.J. 423, 434-40, 136 A.2d 761 (1957). In the circumstances of this case, however, we are satisfied that defendant was not prejudiced by the trial court's refusal to require the prosecutor to release otherwise confidential reports. The entire subject was collateral to the essential issues in the case. We are fully convinced that this minor episode had no impact on the jury's ultimate verdict.
Finally, we find no prejudicial error in the trial court's instructions. The evidence presented at trial did not "clearly indicate" the appropriateness of an instruction on the lesser included offenses of criminal restraint (N.J.S.A. 2C:13-2) or false imprisonment (N.J.S.A. 2C:13-3). State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985). No request to charge having been made, the trial court was not obliged "on its own meticulously to sift through the entire record ... to see if some combination of facts *37 and inferences might rationally sustain" a finding as to the lesser included offenses of kidnapping. Ibid. Further, the trial court's instructions on causation fairly comported with the principles cited in State v. Martin, 119 N.J. 2, 573 A.2d 1359 (1990) and State v. McClain, 263 N.J. Super. 488, 623 A.2d 280 (App.Div.), certif. denied, 134 N.J. 477, 634 A.2d 524 (1993). Lastly, the trial court did not commit plain error in its instructions on accomplice liability. Viewing the court's charge as a whole, we are satisfied that the jury was told to focus on the defendant's intent and participation and was not misled. State v. Bielkiewicz, 267 N.J. Super. 520, 632 A.2d 277 (App.Div. 1993).
Affirmed.